# Case No. 983.

### BARING et al. v. LYMAN.

[1 Story, 396;[1] 4 Law Rep. 303.]

Circuit Court, D. Massachusetts, May Term, 1841.

NEGOTIABLE INSTRUMENTS — LETTER OF CREDIT— PARTNERSHIP—AGENCY.

1. Where, by a banker's circular, a banking commission was named on credits or bills "used east of the Cape of Good Hope;" it was *held*, that the drawing of bills under a letter of credit, in favor of a third person, who, upon the faith of the letter of credit, takes and receives the same for value, and is entitled to hold and use them on his own account, is a use of the letter of credit within the terms of the circular, although the bills are never presented for acceptance or payment. Thus, the agent in Boston of certain London bankers, gave to A. a letter of credit, by which B., in Canton, was authorized to value upon them to the amount of £25,000 sterling at six months' sight, at Canton, the customary commission on bills, used under similar letters, being two per cent. The credit was obtained to furnish funds in

[1] [Reported by William W. Story, Esq.]

part for loading the ship of A., which was consigned to B., at Canton. Bills were accordingly drawn in Canton by B. payable to C., but as there was no demand whatever at that time for exchange, the latter agreed to send the bills to his agent in Boston, and to give A. the option of replacing them, with other funds, or to have them forwarded to London, to the account of C. On the arrival of the bills in Boston, A. concluded to reimburse C. by remitting dollars to Canton, and the bills and letters to the London bankers were destroyed. An action, brought by the London bankers for the customary commission on the bills, was defended on the ground, among others, that they had never been used; but it was held, that the defence was not maintainable.

[Cited in Russell v. Wiggin, Case. No. 12,-165.]

2. Any partner in a firm may be the agent of a third person in drawing bills in favor of the firm, for advances made to such third person, under an express authority.

3. A firm may negotiate its own paper to one partner, and the latter will thereby become the owner thereof. So, a firm may take a separate negotiable security from one of its partners, and hold and use the same for its own purposes. A fortiori, where he acts as the agent of third persons.

At law. Assumpsit [by Francis Baring and others, comprising the firm of Baring Bros. & Co., against Theodore Lyman, as executor of T. Lyman, deceased] for the recovery of money, viz., five hundred pounds sterling, claimed as due to the plaintiffs for commissions, at the rate of two per centum, upon twenty-five thousand pounds, alleged to have been drawn for by Robert B. Forbes, in bills upon them, under a letter of credit, given by them to the defendant's testator, dated 7th of June, 1838. By that letter, Forbes was authorized to value upon them to that amount, at six months' sight at Canton, on account of the testator; the bills to be duly honored, when presented at the banking house of the plaintiffs, if drawn within twelve months from said date. And in case of accident to Mr. Forbes, whereby he should be prevented from attending to the business, Messrs. Russell & Co., of Canton, were authorized to use the credit for account of the testator. By a receipt in writing of the same date, the testator, in consideration of the said credit, agreed to provide in London, sufficient funds to meet the payment of whatever (bills) might be negotiated, by virtue thereof, at maturity of the bills, and also to give security therefor, here, at any time previous, if required; and that the property, which should be purchased by means of said credit, and the proceeds thereof and the policies of insurance, and bills of lading, were thereby pledged as collateral security for the payment as above provided, and held subject to the plaintiffs' order, on demand, with authority to take possession and dispose of the same at their discretion, for their security and reimbursement; that in all payments, settlements, and recoveries in the United States, growing out of the said credit, the pound sterling should be estimated at the current rate of exchange on London, existing at the time of such settlement. And the testator added a request and direction to his executors and administrators, that in the event of his decease, before maturity of all the bills, which might be drawn under the above credit, and the due provision for the same, as stipulated, they should provide promptly for them, as they should become payable, without regard to the probate laws of Massachusetts. The regular and customary commission charged by the plaintiffs, on bills used under similar letters of credit, east of the Cape of Good Hope, is two per cent. And if the whole amount authorized is not used, the commission is charged only on so much as is used. The credit was given to furnish funds in part for loading the testator's ship Vancouver, which arrived at Canton, December 1, 1838, consigned to R. B. Forbes, who became a member of the house of Russell & Co., 1st January, 1839. The consignment was agreed upon by him and the testator, before the credit was procured. The business of the ship was transacted by Russell & Co. On the 18th of March, 1839, Russell & Co. wrote to the testator, advising him of their determination to load the ship and despatch her directly for Boston; and that there being no demand whatever for exchange, even at the very unfavorable rate, at which they had concluded to place his bills, they had obtained a loan for the purpose of getting the ship away. But that as Mr. Forbes had no orders to resort to, he authorized them to draw the bills at the market rate, and to give him his choice of paying for them in London, or replacing the cost of the cargo in dollars, without delay, paying at the rate of nine per cent. per annum interest; and that they should charge their usual commission of one per cent. for drawing, and should send the bills and letters of advice to their agent in Boston, to be cancelled, upon his agreeing to replace the funds, or to be forwarded to London for their account, if he should conclude to meet them there. This arrangement was consummated on their part, by their loading the ship, and sending forward the bills drawn by R. B. Forbes, May 4th, 1839, in favor of Russell & Co., as proposed, and specially indorsed to their agent, J. M. Forbes, of Boston, with corresponding instructions. The testator died on the 24th of May, 1839, before the letter or ship arrived; and they were received by the defendant, who, without delay, notified J. M. Forbes, that he should remit dollars to reimburse Russell & Co., at Canton. Neither the bills and letters to Baring & Co., accompanying them, nor any advice thereof, were ever sent forward to London. But the bills were destroyed by the said Forbes, after the specie was shipped and received. The specie was shipped by the defendant, in the years 1839 and 1840, and received and credited by Russell & Co. in 1840 and 1841, the proceeds of which covered the amount of the advance.

The bills before mentioned were held by J. M. Forbes for Russell & Co., on the 11th of July, 1840. The case was submitted to the court on the above statement of facts, with liberty for either party to refer to certain letters and documentary evidence, which were in the case. Among these was a circular of the plaintiffs, dated January 1st, 1838, a copy of which was sent to the testator, in which it is stated, that "the banking commission on credits or bills used east of the Cape of Good Hope, to be two per cent." The other documentary evidence is sufficiently exhibited in the arguments of the counsel and the opinion of the court.

Charles P. Curtis, for plaintiffs.

The question is, whether the credit granted by the plaintiff, to the defendant's testator, has been used, or not; if it has, then the plaintiffs are entitled to the commission of two per cent. on the amount used. It is not denied, that R. B. Forbes, the agent of the defendant's testator, has drawn bills of exchange on the plaintiffs, in favor of Russell & Co., amounting in all to £25,000 sterling; and that Russell & Co. indorsed and forwarded them to J. M. Forbes, their agent in Boston. In point of form, the terms of the letter of credit have been strictly complied with, so that if the bills had been presented to the plaintiffs, at their banking house in London, they would have been bound to their contract to accept and pay them. What more was necessary to constitute a use of the credit? The letter of credit authorized R. B. Forbes to value on Baring Brothers & Co., London, at six months' sight, at Canton, for account of T. Lyman, Esq., of Boston, for any sums not exceeding £25,000 sterling; and by a subsequent clause, Russell & Co. were authorized to use the credit, in case of accident to Forbes. What is the mercantile meaning of the phrase, to value on a banker? To draw and pass bills on him, to negotiate bills on him. The authority given to R. & Co. in the event of Forbes' inability "to value" on the plaintiffs, is, to use the credit, as he was to use it, that is, by drawing and passing bills under it. The agreement of the testator, acknowledging the receipt of the credit, contains an engagement on his part, to provide funds in London to meet the payment of whatever bills might be negotiated by virtue of the letter of credit. These, then, are synonymous terms; to value, to draw and pass bills, to negotiate bills, is to use the credit. The use of such a credit cannot depend upon the subsequent use of the bill drawn under it. If the party, who grants the letter of credit, is for any period of time liable to accept the bills, the credit has been used, and the whole commission earned. The liability of the banker is fixed, as soon as a bill is negotiated, in conformity with the terms of the letter; for, by the law of the United States, the taker of a bill so drawn, who receives it on the faith of such a document, has a right to claim upon it as an accepted bill; and though this may not now be the law of England, (which is the place of performance of the contract in this case,) yet there a suit in chancery might be maintained by the holder of such a bill of exchange, to compel the specific performance of the banker's agreement. The bills drawn by R. B. Forbes, in May, 1839, and negotiated to Russell & Co., were held by them, in the hands of their agent, J. M. Forbes, for upwards of a year, as appears by his letter of the 11th of July, 1840; during all which time the plaintiffs were bound to honor them at any time, when they should be presented at their banking house. The act of the defendant prevented them from honoring the bills; but they were always ready to do so. And this is sufficient to entitle them to their commission, which does not depend on the actual acceptance and payment of the bills, but on their liability to do so. It might be contended with safety, if necessary, that the plaintiffs would be entitled to their commission on the amount of their credit used, as before stated, even if they had refused to accept the bills; for, in that case, the holders would have their legal remedies, as before stated, and the testator would have had a right to recover from them for all the damages he might sustain from their breach of promise. But the case does not require the assertion of this principle; the whole service stipulated by the plaintiffs, or at least as much of it, as was not prevented by the defendant, was performed by the plaintiffs, and they were always ready to perform the residue.

If it is contended by the defendant, that the bills drawn by R. B. Forbes, were not used or negotiated, the answer is found in R. B. Forbes's deposition, who says: "I drew bills for £25,000 sterling, on Baring Brothers & Co. at six months, dated Canton, 4th May, 1839, in favor of Russell & Co., and indorsed by them to J. M. Forbes, Esq., Boston." "The bills were held by Russell and Co. as their security for the advance they had made; they had no orders to advance funds for Mr. Lyman; but thinking it was for his benefit, they did it, and held the bills as their security. Mr. Lyman's instructions were merely to act in exchange." The letters of Russell & Co. to the testator, also, show, that the value of the bills was actually passed to his credit; the cargo was paid for by his agent, by bills on the plaintiffs, and was shipped to Mr. Lyman as his property. But Russell & Co., regarding his interest in the transaction, gave him the option of providing for the bills in London, or of redeeming them in the United States, by shipping dollars to Canton. Mr. Lyman, the defendant, elected the latter alternative, and the bills were held by J. M. Forbes, till the dollars were received in Canton. This was in effect a purchase by the defendant of his testator's bills, on better terms than the payment of them in London

would have been. Mr. Lyman has availed himself of the benefit of the plaintiff's high credit; his cargo was purchased and shipped to him on the faith of it; he has had the opportunity of a more advantageous mode of remittance than he expected, when he took the credit; he has enjoyed the whole consideration for which the plaintiff's right to compensation accrued; and he is therefore legally bound to pay the stipulated price.

Charles G. Loring, for defendant.

What was the contract, and what was done under it? The contract is contained in three documents, namely, a letter of credit given by the plaintiffs, through their agent, Mr. Ward; the receipt given by the defendant, and the circular of the plaintiffs. By the letter of credit, Mr. Forbes, or, in event of accident to him, Messrs. Russell & Co. were authorized to draw upon the plaintiffs to the amount of £25,000, at six months sight, if drawn within twelve months from 7th of June, 1840; and the plaintiffs promised to honor the bills, when presented at their banking house. The obligation, therefore, was to accept the bills, if presented at their banking house, within the time specified, and nothing more. Consequently, they could be under no liability until such presentation. By the receipt, the testator promised to provide funds in London to pay whatever bills should be negotiated by virtue of the credit, at their maturity; and to give security in Boston previously, if required. And, that all property purchased by means of the credit, &c. should stand pledged as collateral security for such payment; that all settlements growing out of the credit should be at the current rate of exchange; and in the event of the death of the testator before the maturity of the bills, his executors, &c. should provide promptly for them as they should become payable. This is the whole contract on his part, excepting as to the compensation, which the plaintiffs were to receive, which was not specifically provided for, but left to the operation of the custom of the plaintiffs, which is set forth in their circular. By the circular, it was stated, that "the banking commission, on credits, or bills, used east of the Cape of Good Hope, was to be two per cent." The use, for which this compensation was provided, is clearly indicated, by the whole tenor of the circular, to be the negotiation of the bills and acceptance of them by the plaintiffs; corresponding precisely with the use, as described in the letter of credit itself, the gist of which is the promise to accept. And also, with the use described in the receipt, which provides for providing funds to meet such bills, as should be negotiated, at their maturity, which necessarily implies acceptance. Upon this contract, then, two things are clear. (1st.) That the use of the credit contemplated by both parties, was, the drawing and delivery of bills for the purpose of their being pre-

sented to the plaintiffs to be accepted by them, whereby they would assume the liability of acceptors; and that the compensation or commission was to be for such a use, and nothing short of it; for there could be no pretence, that the mere issuing of the letter of credit, if no bills were drawn, or that if the plaintiffs should refuse to accept any drawn, the commission would then be due. (2d.) While the contract was obligatory on the plaintiffs to accept all bills so drawn and presented, it was perfectly optional with the testator, whether to use the credit, or not to use it. He might have destroyed it, or kept it in his pocket until the expiration of the twelve months, with the right to use it at pleasure; but unless he had actually used it, he was under no liability to pay any compensation to the plaintiffs. The power and the right to use it, were, therefore, totally distinct from the actual use; and the testator might desire and enjoy great benefits from possession of the mere power; but such results from its mere possession, would give no right to the plaintiffs to claim compensation. Nothing short of the exercise of that power, that is, the actual use of the credit as stipulated for, could give them any claim to the compensation agreed upon.

The question, then, is, whether there was any such use of this credit, as was contemplated as the consideration of the commission. The facts are, that the letter of credit was delivered to Mr. Forbes, who became one of the firm of Russell & Co., who were the consignees of the vessel, and on whom the testator relied to furnish the cargo, before any steps were taken to procure one. Finding it difficult or impossible to negotiate any bills under this credit, in order to procure a cargo, in the manner directed by the testator, this firm negotiated a loan of money on their own credit, on his account, with which the cargo was procured. This being done without his authority, and not being binding upon him unless ratified, they gave him notice accordingly; and, in order to provide for the contingency of his refusing to ratify this proceeding, and reimburse themselves for their advance, Mr. Forbes, then being one of the firm, drew these bills in favor of his house, and sent them to their agent here, with a letter of advice to the drawees, to be forwarded to them at London for acceptance, if the testator should refuse to ratify and provide for the loan; but to be destroyed, if he should ratify and provide for it; and, in order to preserve the usual formal regularities in such cases, the bills were charged at the current rates in the books of the firm. But the bills were never negotiated, nor for a moment out of the possession or control of the firm. The testator did ratify the loan, and pay it; and the bills were consequently cancelled here, and the plaintiffs were never notified of their being drawn, and were never called upon to accept or provide for them. Upon these facts, it is denied, that there was any

use of the credit, which entitles the plaintiffs to a commission. It is clear, that the right to use, or not to use, the credit, was entirely at the option of Mr. Lyman or his agent; and equally so, that it was optional with him to make the use of it dependent upon any contingency or condition to occur within the time limited. It is obvious, too, that any "use of the credit," which should vest a right in the plaintiffs, must be one that bound them, or made them liable to the party receiving or acting upon the credit or bills; for, unless they incurred some obligation or responsibility, their credit was not used. And, in this case, as the bills were payable at a given time after sight, it is clear, that the payees, Messrs Russell & Co., could have no claim on the bills until actually accepted; and that their only remedy, if they had finally resorted to this credit, must have been by a special action on the case, founded on the letter of credit, and their reception of the bills under it. So that the letter of credit, and not the bills, could alone give them any security.

Now, then, there is no pretence, that the cargo was purchased. on the faith of this credit. It was quite otherwise. They expressly forbore to use it; they adopted other means of procuring the cargo, and pointed out other means for the testator's reimbursement of their advances. The utmost. that can be alleged, is, that Messrs. Russell & Co. would not have made the loan, but for the power they possessed of using this credit, if they should see fit so to do, on the testator's refusing to ratify the loan. But this was no more than a mere possession of the power to be used at their option, upon the happening of a contingency, but was not any actual exercise of it. Messrs. R. & Co. might well say; "We will furnish the cargo, but whether we shall use the credit. or rely upon other resources, we shall decide hereafter;" and they might be so far influenced in furnishing the cargo by the power to use the credit, that they would not otherwise have done it. And yet, as between them, or the testator, and the plaintiffs, there would have been no use of it. The benefit thus derived from the possession of the letter of credit to the testator, would have been incidental and collateral merely. not affecting the plaintiffs in the slightest degree, and not contemplated by the parties, as a subject of compensation.

Keeping in mind the distinction between the use of the credit and the mere power to use it, let us see, whether the facts show any actual use of it. It is apparent, that in the drawing and delivery of the bills to his firm, Mr. Forbes acted as the agent of the testator, as well as a partner of the house; so that there could be no possibility of misapprehension of the mutual understanding and intention of the parties. In the drawing and delivery of the bills, he was the agent of the testator, and had his

power of absolute or conditional use of the credit. Did he, then. by his acts, create any actual liability or responsibility on the part of the plaintiffs, by the drawing of these bills? Or was such liability entirely contingent upon the happening of a future event? It will not be pretended, that the mere drawing of the bills, was a use of the credit; for if he had locked them in his desk, or delivered them to his firm for safe keeping merely, surely no one would say, that he had used the credit, and that the plaintiffs were entitled to their commission. What, then, were the circumstances and terms, upon which he drew and delivered these bills. He and his partners had already advanced funds for purchasing the cargo, and had elected to give the testator the opportunity of reimbursing them without using the credit. When, therefore, the bills were delivered to the house, it was upon condition, that they should not be used, and that the house should not have any claim under the letter of credit. unless the testator refused to ratify the loan, and otherwise reimburse the advances. This condition of the delivery was communicated in writing to the testator, and constituted a written contract between him and them. It is certain. therefore, that although the house were in possession of the bills and letter of credit, they could not use them, nor have any possible claim upon the plaintiffs, until the testator had made his election; and that upon such election to ratify the loan and repay the advances, the bills and letter of credit became, as blank paper,—a mere nullity. In other words, there had been no actual use of the credit, but something remained to be done, before it should be decided, whether the right of using it, should, or should not, be exercised; and the contingency, upon which it was not to be exercised, having happened, no use was ever made of it. Suppose a suit had been brought by Russell & Co.. upon the credit, against the plaintiffs. before or after the testator had made his election. it is manifest, that the facts stated would prove a perfect defence. It would appear, that Russell & Co. so far from acting on the faith of the credit, or any liability of the plaintiffs, had in truth declined so to do; they had made their advances upon a different credit, and with a view to a different resource for reimbursement; and had, at the most. only a contingent right to resort to this upon the happening of an event, which had never taken place. Suppose, that Mr. Forbes had never drawn any bills, but retained the letter of credit in his possession, with the intention to draw, if the testator should not ratify the loan and reimburse the advance; could it be pretended, that the credit had been used, and that the plaintiffs were entitled to their commission? Clearly not. But the case at bar is essentially the same; for the delivery of the bills to Russell & Co., being upon the condition stated, would as

effectually prevent their recovery during the continuance of the condition, as if the bills had not been drawn; for proof of the condition would defeat any intermediate claim; and the position of Forbes, as agent of the testator, and a partner of the house, rendered it as safe and easy for all parties to protect them, by this delivery of the bills on condition, as could have been done by his omitting to draw, until the condition should terminate. And it is plain, that the reason, why he did draw, was, not to give or create any security to the firm, for that already fully existed in his power to draw, he also being one of the firm; but his only object was to facilitate and expedite arrangements here, if the loan should not be ratified. It is substantially the same thing, as if he had retained the letter of credit and bills in his own hands, to await Mr. Lyman's decision. As to the alleged notice to the plaintiffs, of the use of these bills, none was given. Forbes or Russell & Co. withheld any, not intending to notify them, or put them to any liability or trouble, unless the testator should reject the loan, and they were the only persons to notify. The letter of the executor, after the testator's death, was no notice, that any bills were, or would be drawn; for he could not know, that any would be. It was no more that a notice, that any bills drawn under the letter of credit, which the plaintiffs, doubtless, had from their agent here, would be provided for.

To illustrate the position, we take, that the cargo was not furnished on the faith of this credit, nor any such use made of it, as entitles the plaintiffs to their commission, the following may be suggested as parallel cases. Suppose, that the testator had proposed to Forbes here, to purchase the cargo by an advance or loan, such as was made, and to be repaid in the same manner; and Forbes had refused, but would agree to do it, if the testator would furnish him such a letter of credit as this, to be used, if circumstances should render it inconvenient to make the loan, or more advisable to resort to bills of exchange; and this had been done, and his house had proceeded to procure the cargo without first determining, which fund they would resort to, but had finally determined to make the loan, and not to use the credit. There would be in such a case, a purchase of the cargo, on the faith of the credit, equal to that alleged here, and as much a use of it. But no one would pretend, that the plaintiffs would be entitled to a commission, for there was no purchase on the faith of the credit; nor was there any use of it, affecting the plaintiffs for an instant. Or, suppose, the testator had agreed with Forbes, that his house should furnish a cargo, to be paid for by a shipment to be made to them by the testator, if he would furnish such a credit as this, to be used, if the shipment should not arrive within a limited time, and the cargo was fur-

nished before the arrival of the shipment,—which, however, was received within the time; and so no bills were drawn. There would have been precisely such a use of the credit in that case, as there was in this; but surely no commission would have been earned. The only distinction between those cases and this is, that in them, the contingency, upon which the use of the credit was to depend, was contemplated by the parties, when it was delivered to the agent, so that an absolute use was not then contemplated. But it is not perceived, why one might not be created by the agent, subject to the ratification of the principal; and be as effectual, if ratified, as if originally appointed. In either case, there would no actual use of the credit until the determination of the contingency.

The position, taken by the plaintiffs' counsel, amounts to this; that if the consignee or agent be influenced by the mere power of using the credit, this is such a use, as entitles the party, giving it, to his full commission. But it seems clearly untenable. The power to use, is created by the mere delivery of the letter of credit. Its exercise is entirely at the volition of the receiver. And neither he nor his agents are bound to any immediate or absolute decision, but may exercise the right of election at any time within the period limited, and upon any reasonable contingency; and it is the exercise, and not the mere possession of the power, which gives the right of compensation. As to the language of Mr. Forbes in his deposition,—wherein he states, that the house of Russell & Co. held the bills as collateral security,—we are to look to the facts to ascertain, what he means by those terms, and not to take this mere declaration as proof of a position inconsistent with these facts. Now, upon the facts appearing in the correspondence and deposition, it is manifest, that Russell & Co. did not hold the bills as collateral security; properly speaking they merely held the right to use them as such. The bills in their hands were in themselves of no avail, to bind the plaintiffs, being after sight, and if they would have been binding on the plaintiffs, if delivered, to be sent to them, they were not so here, for they were not delivered to Russell & Co., to be sent for acceptance, but to hold until a certain contingency should happen, which was to determine, whether they should be sent or not. Russell & Co. were not, therefore, in possession of those bills, with any right whatever to use them, and never could have acquired that right upon a condition, which never happened. In truth, therefore, the only security which Russell & Co. had in the possession of the bills, was the power to use the credit, if the condition should happen, upon which the use was to depend. But the same power existed, the moment the credit was delivered by the testator to his agent. And the mere possession of the power was surely no exercise of it. In order to say properly, that the bills were

held as collateral security, it should appear, that the holder had elected to use them, by notifying the drawees, or taking the usual means to bind them. It is one thing to possess the power to use the credit, and quite another to use it by an actual exercise of the power. The mere drawing of the bills, as above shown, was no use of the credit; for they might have been locked up in Forbes's desk. Nor was the mere delivery of them into the hands of Russell & Co. such use; for the delivery was to them, as bailees, for safe keeping, merely until the happening of a contingency, which alone would authorize the use of them, and which never occurred. No moment has ever existed, when Russell & Co. could claim of the plaintiffs to accept or pay these bills. Any presentation for acceptance, would have been a violation of the trust, reposed in them by Forbes and the testator; and the facts existing would have exonerated the plaintiffs from all obligation to accept or pay, if Russell & Co. had attempted to induce or compel them to do so. The mere drawing and delivery of the bills, upon such a condition, is no more a use of the credit or the creation of a collateral security, than the intention of drawing upon such a contingency would be. Suppose, that instead of thus drawing and delivering the bills, the house had made the advance, relying on Forbes's power so to draw, in case the testator should not ratify the loan; and that it be admitted, that otherwise they would not have made the loan. There would have been just as much reliance on this credit, as collateral security, in that case as in this. In other words, the power to draw would be the collateral security, such as it was here. But would any one pretend, that it was a use of it, which entitled the plaintiffs to a commission?

The case has thus far been presented, as if Forbes and Russell & Co. were not partners, when the bills were drawn and delivered; but it is much strengthened by the consideration, that they were such. For the case, in that point of view, becomes the same, as if Forbes had merely drawn the bills and kept them in his own pocket. He and Russell & Co. were one person; and the drawing and delivery of the bills in the manner proved, amounts, in fact, to nothing more than the mere intention to draw, if the emergency should require it. It cannot be correctly said, that the contingency, upon which the bills were to be used, was a condition subsequent, and not precedent. For none of the acts, which were to be done, upon the drawing of the bills, for the purpose of creating any liability on the part of the plaintiffs, were performed. If the bills had been so drawn, the property, by the terms of the contract, was to be pledged to the plaintiffs; and bills of lading, &c., were to be made out, and forwarded to the plaintiffs in a particular manner; and they were to be notified of the drawing, &c. To constitute this a condition precedent, all the measures should have been taken to fix a present liability, with notice of the condition of defeasance; and the plaintiffs should have been informed of the drawing intended, and use of the bills, and that they should be held responsible, unless the testator should elect 'to ratify the loan. Instead of which, all these preliminaries were dispensed with, and the notice was deferred, until the plaintiffs' election was made. it was clearly, therefore, a condition precedent, and not subsequent. And such is the plain purport of the correspondence. [Judgment for plaintiffs.]

STORY, Circuit Justice. The first question naturally arising in this cause, is, as to the true construction of the circular of the plaintiffs, of the 1st of January, 1838, with reference to which the letter of credit in the present case was given and accepted by the testator, Lyman. By that circular, Messrs. Baring & Co. expressly stated, that "the banking commission on credits or bills, used east of the Cape of Good Hope (is) to be two per cent." The question is, what is to be deemed in the sense of this circular a use of the bill of credit? Is it the mere drawing of any bill under the letter of credit, in favor of a third person, who, upon the faith of the letter of credit, takes and receives the same 'for value, and is entitled to hold and use it on his own account? Or is it necessary to make the right to the commission attach, that it should be presented to Messrs. Baring & Co., and accepted and paid by them, or at least should be accepted by them? If it be necessary, that acceptance and payment, or, at least, that acceptance by them, should take place before the right to the commission attaches, it is very clear, that the present action is not maintainable; for there never has been any presentment of the bills, drawn in the present case. My opinion, however, is that neither presentment for acceptance to Messrs. Baring & Co., nor payment by them, is essential, under the terms of the circular, to give the right to the stipulated commission. In the sense of that circular, the bill of credit was used the moment any bills were drawn upon Messrs. Baring & Co. under the letter of credit to the testator, Lyman, and placed in the hands of holders, who took it for value upon the faith of the letter of credit, and thus became entitled, as such holders, to require an acceptance and payment thereof, according to their tenor, whether they were ever presented for acceptance and payment, or not. My reason is, that Messrs. Baring & Co. from the moment, that such bills were drawn and taken for value, became bound, as well to the holders, as to Lyman, to accept the bills upon presentment, and to pay them at maturity; and if they had refused, an action might have been

maintained against them, upon the promise contained in the letter of credit, not only by Lyman, but by the holders. Indeed, if the bills were made payable at a certain time after date, instead of after sight, and were received by the holders upon the faith of the letter of credit, the holders might maintain an action thereon against Messrs. Baring & Co., as upon a virtual acceptance. Such was the decision of the supreme court in the case of Coolidge v. Payson, 2 Wheat. [15 U. S.] 66, following out the doctrine of the cases of Pillans v. Van Mierop, 3 Burrows, 1663, and Pierson v. Dunlop, 2 Cowp. 571, and Mason v. Hunt, 1 Doug. 296.

It is of no consequence, what were the nature and extent, or conditions, of the contract between the holders and Lyman, under which the bills were received, provided Messrs. Baring & Co. became for a single hour liable to accept and pay the same to the holders; for every such contract would be res inter alios acta, with which Messrs. Baring & Co. could have nothing to do, and of which they could have no power to avail themselves, not standing in privity with the parties thereto. The question is not, what were the duties or liabilities between Lyman and the holders, under the bills and contract connected therewith; but whether Messrs. Baring & Co. were liable thereon. The use made of the bills by the holders for value, after receiving them, was of no consequence to Messrs. Baring & Co., or whether any use was made by them at all; but whether any responsibility attached to them for a moment, to accept or pay the bills under the letter of credit. The commission is, by the very terms of the circular, to arise from the use of the letter of credit, and not from the use afterwards made of the bills drawn under it. Suppose the bills had been unconditionally transferred to third persons, so as to become their absolute property, and afterwards, upon a new negotiation, they had been delivered up and cancelled by the parties before acceptance, would not the right to the commissions have attached? Suppose the bills had been accepted by Messrs. Baring & Co., and afterwards and before the maturity, they had been taken up and paid by Lyman, would not the like right to the commission have attached? The commission was a commission, not accruing upon the payment of the bills, but designed as an indemnity and compensation for the risk run, and responsibility incurred by Messrs. Baring & Co. and their duty to accept and pay the bills, if drawn under the letter of credit. If ever there would be perfect justice in the application of the maxim, Qui sentit commodum sentire debet et onus, the present case, under such circumstances, would seem to furnish a fit occasion to apply it. I agree, that if Messrs. Baring & Co. were never responsible to the holders of these bills at all, and that no right attached in favor of the holders, for a moment, to

bind them to the acceptance thereof, then they have no claim for the commission; for they have not earned it, and the letter of credit has not been used. On the other hand, if they are entitled to any commission, they are entitled to the whole commission, for there can be no apportionment of the contract at law. If the bills have been subsequently withdrawn, or paid by Lyman, that cannot vary the rights of Messrs. Baring & Co., if any rights once attached. It is a mere waiver by the holders and Lyman, of the right to require an acceptance and payment of the bills, instead of Lyman's providing for a subsequent reimbursement, after payment thereof by Messrs. Baring & Co. In the receipt of Lyman, of the 7th of June, 1838, he acknowledges the receipt of the letter of credit, and among other things, he promises "to provide, in London, sufficient funds to meet the payment of whatever may be negotiated by virtue thereof, at the maturity of the bills." Now, it seems to me, that the word "negotiated" is here used in precisely the same sense, as the word "used" in the circular. A bill is properly said to be negotiated, when it has passed into the hand of the payee, or indorsee, or other holder for value, who thereby acquires a title thereto.

In my judgment, therefore, the whole case turns upon the consideration, whether these bills were, at any time, in the hands of the holders, valid subsisting bills, taken by them for value, and held, either absolutely, or as security, for advances made to Forbes on account of Lyman; or whether they were merely lodged in the hands of Russell & Co., not to give a present title of any sort thereto, as security, or otherwise, but merely as a future-springing, contingent title, dependent upon future occurrences, and in the meantime to be held as a mere special bailment in trust and for the benefit of Forbes or Lyman. In other words, the question seems to me (as I intimated at the argument), to resolve itself into this point, whether the bills were in the hands of Russell & Co. upon a condition-precedent, or a condition subsequent. If the former be the true view of the facts, then they took no title whatsoever in the bills, except in the event, that Lyman should refuse to ratify the acts of Forbes, as to the advances and arrangements made for the benefit of Lyman, in lieu of the bills. On the other hand, if the latter be the true view of the facts, then a present title to the bills passed to Russell & Co., subject to be divested by the acceptance and ratification by Lyman of the acts and arrangements of Forbes. And to the consideration of this point I shall now address myself. It is not an unimportant circumstance, in examining this point, that Forbes, the agent of Lyman, and a partner in the house of Russell & Co., through whom the whole transaction was negotiated, and who certainly stands before the court as a disinterested witness, explicitly states in

his deposition, that "the bills were held by Russell & Co. as their security for the advances they had made. They had no orders to advance funds for Mr. Theodore Lyman; but, thinking it was for his benefit, they did it, and held the bills then as their security." Now, if this statement is to be relied upon, as the true exposition of the transaction, it puts an end to the controversy; for if the bills were held by Russell & Co., as a present security for their advances, they had a present title to them, and a present right, against Messrs. Baring & Co., to demand the acceptance and payment thereof; otherwise they would be no security at all. Still, Forbes may mistake in the matter; and, therefore, we are led to examine, whether the actual transactions, as disclosed in the correspondence, and other transactions in Canton at the time, do, or do not, confirm his recollection and interpretation thereof. And I must say, that upon a full examination of all the acts and correspondence of the parties, it seems to me, that Forbes is fully borne out and confirmed in his statement by them; and that every other view thereof would be somewhat forced and strained, if not unnatural. In the first place, the bills were actually indorsed and sent by Russell & Co. to their agent in Boston, to await the final decision of Lyman, and if he did not confirm the proposed arrangement, then to be used and forwarded to London. Certainly, this would seem to be the exercise of a virtual authority and title over the bills, as owners, and could, in no just sense, be deemed a mere agency for the drawer, or for Lyman. It vested a title to the bills in favor of the agent at Boston, good against Messrs. Baring & Co., and against Lyman, and indeed against all the world, except Russell & Co. The natural effect of the indorsement, was that of an indorsement, conferring a present legal title to the agent, to hold and use the bills for the benefit of Russell & Co., and not a mere right to hold the same, as bailee, for the benefit of Lyman, until he had done some future act to transfer the title to Russell & Co. In point of fact, also, although Lyman's executor, (he having died on the 24th of May, 1839, before the advices were received,) assented to the arrangement, made by the agent, Forbes, when the advices were received, and this assent was immediately made known to the agent of Russell & Co., in Boston; yet the bills of exchange were not thereupon surrendered, but they remained in the possession of the agent of Russell & Co. in Boston, (as appears by his letter of that date,) up to the 11th of July, 1840; and, indeed, it is stated, that the bills were not cancelled until December, 1840, after the last remittance had reached Canton. Now, if the bills were intended to take effect solely in the case of Lyman's refusal to assent and confirm the arrangement of Forbes, and not before, as soon as Lyman had so assented to and confirmed it, they ought to have been given up. But the parties did not so act upon the case; nor did Lyman require the bills to be then given up. On the contrary, they were retained without any objection; and this can scarcely be accounted for, except upon the supposition, that they were retained as security for the due fulfilment on the part of Lyman, of the arrangement with Forbes by repayment at Canton, of the moneys advanced by Russell & Co. In this view, the retainer of the bills assumes a natural character. In any other view, it would seem inconsistent with the true rights and duties of the parties. Now, let us suppose, that after Lyman had acceded to the arrangement of Forbes, the moneys advanced by Russell & Co. had never been repaid to Russell & Co., either by the death of Lyman, or by the remittance being lost on the voyage, or in any other manner, would it not be clear, that the bills would be valid and obligatory against Messrs. Baring & Co., in the hands of the agent of Russell & Co., as well as against Lyman? If so, how can they be said not to be a security for the due fulfilment of the arrangement of Forbes? And if they were a security, must they not be so from the time they were actually drawn and delivered to Russell & Co. up to the time, when the advances were repaid in Canton by Lyman? If they were designed as a security in this way, is it not equally clear, that Russell & Co. were, in the meantime, holders of the legal title for value?

Let us, in the next place, see, how the case stands upon the correspondence. The first letter of Russell & Co. to Lyman, of the date of the 18th of March, 1839, at Canton, says; "Your funds, under the credit of £25,000 at five shillings per dollar, with proceeds of rice and specie, we estimate, after deducting expenses of the ship, at about $106,000, which will not fill the ship by about one hundred tons. Freight could not be procured at over twenty dollars per ton; and if we had authority to fill up with freight for Boston, at market rate, we should doubt the expediency of so doing, fearing it might interfere with her ultimate destination. There is no demand, whatever, for exchange at the very unfavorable rate at which we have concluded to place your bills; and we have obtained a loan for the purpose of getting your ship away. But as our Mr. Forbes had no orders to resort to this, he authorizes us to draw your bills at the market rate, and to give you your choice of paying for them in London, or returning the proceeds of the £25,000 to us in dollars, without delay, paying at the rate of nine per cent. per annum, interest, until the amount is refunded. We shall, in either case, charge our usual commission of one per cent. for drawing, and shall send the bills and letter of advice to our agent in Boston, to be cancelled, upon your agreeing to replace the funds, or to be forwarded to London for our account, if you conclude to meet them there." Again, on the 4th of May, 1839, they wrote to

Lyman as follows: "In our letter of the 18th ult. (meaning the 18th of March), we indicated the course, which we then thought of pursuing with regard to your funds. The present aspect of affairs, and the prospect for the future, is much changed since that date, and a different disposition of your bills would now be much more for our interest. But we confirm, what we then said, and now recapitulate more distinctly the arrangement, which we authorize our agent, (Mr. John M. Forbes,) to carry into effect. Our R. B. Forbes has drawn on Messrs. Baring Brothers & Co. under this date, the following bills (enumerating them), proceeds to your credit at five shillings per dollar, making £25,000 sterling. These bills will be forwarded to Mr. T. W. Forbes, Boston, accompanied by the letters of advice. Should you determine to provide for them in London, they will be sent forward immediately. But should you prefer to replace the amounts to your debit, as per statement, annexed in this place, paying interest at the rate of nine per cent. per annum from this date, you can do so," &c. "When the remittance is realized in Canton at the market value, we shall consider your charge of interest at an end, and not till then." The letter of advice of Russell & Co. to their agent in Boston, of the same date, which accompanied the bills, also of the same date, says: "On receipt of this letter, you will please call on Mr. Lyman, or his agent, and offer him a choice of the two plans indicated in our letter to him, one of which is, to allow the bills to be disposed of, as you may deem most for our interest, by selling them in the United States, and investing the proceeds in specie for our account, or forwarding them to London, to be there invested in specie for our account; or on the other hand, to cancel the bills in the United States, upon Mr. Lyman's giving you full security, that the amount advanced to him, as per memorandum at foot, shall be returned to us in specie, the interest at the rate of nine per cent. per annum from this date, (May 4th,) to be charged, until the loan is realized in Canton, the dollars being disposed of at the market rate."

Now, it seems to me manifest, that this correspondence, in its very terms and imports, demonstrates, that the parties understood the bills to be in the hands of Russell & Co. as the true owners thereof for value, as a present, immediate, and continuing security, for the advances made by them under the letter of credit, and the instructions for the voyage; that an option was intended to be given to Lyman to reimburse Russell & Co., by a remittance of the amount, in specie, to Canton; and when that amount was received in Canton, and not till then, the interest was to cease, and the bills were to be cancelled. In this view, the correspondence amply confirms the deposition of Forbes, (the agent of Lyman,) that the bills in the intermediate time were in the hands of Russell & Co., as their

security; and, of course, were their property, and were negotiated to them. Indeed, the language of the correspondence shows, that Russell & Co. treated the bills as their own in point of right and power of disposal, and only offered an option to Lyman to deliver them up, upon his acceding to another proposed arrangement, which was in the nature of a condition subsequent. It can make no legal difference in the case, that the drawing of the bills was never notified to Messrs. Baring & Co. That was not necessary to give them a legal validity, or to bind the latter to accept and pay them. It is sufficient, that they were bills drawn and negotiated for value under the letter of credit, and that the letter of credit was "used" for this purpose. Suppose, after the acceptance of the proposals by Lyman's executor, the terms had not been complied with, can there be a doubt, that Russell & Co. could have enforced their rights under the bills against Messrs. Baring & Co.? They had nothing to do with the new proposals to Lyman, nor with his acceptance or refusal of them. Nor would it have been any justification of their refusal to accept the bills, if Russell & Co. and Lyman had differed on the point, whether the proposals were accepted or not, or what was the true interpretation thereof. If the bills were once negotiated for value, to Russell & Co., conditionally or otherwise, as a present subsisting security, until they were actually cancelled by agreement of the parties, Messrs. Baring & Co. were bound by them. And I cannot but think, that the whole correspondence shows, that so all the parties understood the matter.

It was suggested at the argument, that R. B. Forbes, having become a partner in the house of Russell & Co. at the time, when the bills were drawn and delivered to Russell & Co., might vary the case favorably to Lyman. I am wholly unable to perceive, how any such effect can arise. R. B. Forbes was still Lyman's agent, and the bills were drawn as a security, not to Forbes alone, but to the firm; and the other members had a vested title in the same. There is nothing in the law, which disables any partner in a firm from being the agent of a third person, in drawing bills in favor of the firm, for advances made to such third person, under an express authority. A firm may negotiate its own paper to one partner, and the latter will thereby become the owner thereof; and on the other hand, a firm may take a separate negotiable security from one of its partners, and hold and use the same for its own purposes. A fortiori, the firm may do so, where he acts as agent of a third person.

Upon the whole, upon the best reflection which I have been able to bestow upon this subject, my opinion is, that the plaintiffs, upon the facts, are entitled to recover the full amount of the commissions; and that they ought to have judgment accordingly.